## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDV & CAD GROUP | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil No. 22-cv-40051-MRG |
| | ) |
| SCOPIC SOFTWARE LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

**GUZMAN, J.**

Plaintiff edv & cad group ("edv") brought this action asserting breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), breach of implied warranty of merchantability (Count III), breach of implied warranty of fitness for a particular purpose (Count IV), misrepresentation (Count V), and unfair or deceptive practices (Count VI) claims in connection with Defendant Scopic, Inc.'s ("Scopic") (formerly Scopic Software, LLC) termination of an agreement to develop software.

Pending before the Court are Scopic's Motion to Strike Paragraphs 3-4 and 11-16 of the Affidavit of Johannes Ellmeier [ECF No. 79], Scopic's Motion for Summary Judgment [ECF No. 64], and Scopic's Motion to Exclude the Testimony of Glenn Ricciardelli [ECF No. 68]. For the reasons stated below, Scopic's Motion to Strike Paragraphs 3-4 and 11-16 of the Affidavit of Johannes Ellmeier [ECF No. 79] is **DENIED**; Scopic's Motion for Summary Judgment [ECF No. 64] is **GRANTED** on all counts in accordance with this memorandum of decision; and Scopic's Motion to Exclude the Testimony of Glenn Ricciardelli is **DENIED AS MOOT**.

1

I.    **Background**

Along with its motion for summary judgment, Defendant filed a Statement of Material Facts [ECF No. 66 ("SOMF")] pursuant to Local Rule 56.1. Plaintiff filed an opposition in which it disputed some of the stated material facts and also asserted additional material facts. [ECF No. 77].[1] The following facts are drawn from the parties' statements of material facts and responses.[2] The Court will address any disputes, as well as their materiality, later in the opinion.

### The Parties and the Software Services Agreement

Plaintiff edv is a German sole proprietorship with its principal place of business in Irschenberg, Germany, and is wholly owned by Johannes Ellmeier. [SOMF ¶¶ 3-4]. Defendant Scopic is a software development company registered in Massachusetts. [Id. ¶ 1; SOAF ¶ 39]. Scopic's employees work remotely, though the parties dispute whether Scopic personnel work out of Massachusetts. [SOMF ¶¶ 1-2]. It is undisputed that Scopic's CEO, Tim Burr, resides in Massachusetts, and that Scopic's Chief Operating Officer, Mladen Lazic, has worked out of Massachusetts. [SOAF ¶¶ 40-41; ECF No. 81 at 3].

After researching software development companies online, Ellmeier contacted Scopic about edv's software development needs. [SOMF ¶ 5]. On February 25, 2019, the parties signed a Software Services Agreement ("SSA"). [Id. ¶ 6]. The SSA included a termination provision stating that "[t]he Provider can terminate this contract with 20 business days [sic] via email notification, as well as a return email from the Client or Delivery and Read Receipts." [Id. ¶ 7]. The SSA also cautioned that "estimates are non-binding and only provided for Client information and planning purposes. The Provider can provide precision and confidence information for estimates but this

---

[1] For ease of reference, the Court will refer to edv's Responses to the SOMF as "Response to SOMF," and to edv's Statement of Additional Material Facts as "SOAF."

[2] Fed. R. Civ. P. 56(c) allows the Court to consider both materials cited, and "other materials in the record." Therefore, when necessary, the Court will rely upon materials in the record to supplement the factual background.

does not imply any cap on hours." [Id. ¶ 8]. This sentiment is further emphasized in the messages accompanying the Software Development Proposal sent to edv on June 19, 2024, stating that Scopic's estimates "were rough in terms of tasks and numbers . . . until we have Scope of Work agreed with you we cannot detail them properly." [Id. ¶ 10].

Scopic agreed to develop multiple software projects for edv. [Id. ¶ 9]. The two primary projects were an online cabinet planning software called "WebCabinet Maker" and a related customer relationship management software called "ElementsWeb." [Id.]. ElementsWeb is also referred to as IKT Online-Administration-Software ("IKT") in contemporaneous documents. [Id.]. Valeart Doli served as Scopic's project manager for edv's projects. [Id. ¶ 9].

### ElementsWeb Development

Edv and Scopic began discussing ElementsWeb around May 2019. [Id. ¶ 10]. The parties dispute the nature of these discussions, with edv asserting that in addition to discussions about how edv envisioned ElementsWeb would perform, edv also provided Scopic with "ElementsAV," an existing software program. [Response to SOMF ¶ 10; SOAF ¶¶ 49]. On June 19, 2019, Scopic provided a Software Development Proposal for ElementsWeb. [SOMF ¶ 10]. The proposal featured a disclaimer stating: "The work involved in the project was estimates [sic] initially and has been in [sic] included in the following tasks, which are subject to change after discovery phase." [Id. ¶ 11]. However, the proposal also stated: "The vast majority of Scopic hourly projects are completed within established estimates. You will receive regular reports from project managers to confirm that your project is within estimates and on track to be completed by the agreed-upon deadline." [SOAF ¶ 50].

Scopic then undertook a discovery phase to clarify the details of the project. [SOMF ¶ 12]. In September 2019, Scopic informed edv that the project would take more time than originally

estimated. [Id.]. On May 8, 2020, Scopic sent edv revised estimates for completing ElementsWeb, broken down into three milestones: "M1," "M2," and "M3." [Id. ¶ 12].

### The Addendum to the SSA

Scopic originally worked at a rate of $22.50 per hour. [SOMF ¶ 13]. After receiving Scopic's revised estimates, edv indicated that it would not be able to continue the relationship with Scopic due to financial constraints. [Response to SOMF ¶ 13]. In response, Scopic drafted an Addendum to the SSA (the "Addendum") that provided for discounted hourly rates. [SOMF ¶ 14]. The parties dispute whether these temporary incentives applied only to ElementsWeb or to other projects as well. [Response to SOMF ¶ 14; SOAF ¶ 66]. The parties executed the Addendum on or about May 27, 2020. [SOMF ¶ 17]. Under a heading entitled "Milestone Completion," the Addendum provided that a milestone shall be deemed completed, among other things, five business days after delivery if edv fails to perform acceptance testing. [Id.]. The Addendum further stated: "This Addendum and Temporary Incentives will remain in effect until the M3 completion. The Provider reserves the right to terminate this Addendum and cancel Temporary Incentives immediately in case of violation of its terms by the Client." [Id.]. The Addendum provides that "[t]emporary incentives mean discounted rates . . . that are charged by the Provider on the IKT Online-Administration-Software project." [Id. at 1]. Edv disputes that the Addendum applied only to ElementsWeb, and that the Addendum supersedes the SSA. [SOAF ¶ 65].

On March 5, 2021, Scopic delivered a version of Milestone 1 of ElementsWeb to edv for bug-testing, triggering a five working day acceptance period. [SOMF ¶ 20]. The parties dispute whether edv performed any bug-testing during this period. [Id. ¶ 21; Response to SOMF ¶ 21].

### Development of WebCabinet Maker

In the fall of 2019, Ellmeier asked for Scopic's help in developing the WebCabinet Maker, telling Doli "we want to give the development of web Cabinet [sic] to scopic [sic]." [SOMF ¶ 22].

On February 4, 2020, Doli shared "initial estimates" for the project, qualifying that "[t]hese are rough initial estimates" and that "[w]e will need still to agree on a final Functional Specification Document which will include also the final design of the Cabinet Maker Tool and all its 3D elements." [Id. ¶ 23]. No formal specifications were ever created for the WebCabinet Maker. [Id. ¶ 24]. Instead, edv submitted functionality requests through Jira, Scopic's ticketing software. [Id.]. The parties dispute whether this process arose solely due to edv's preference, with edv contending that Scopic decided to adopt an agile software development approach for WebCabinet Maker due at least in part to its own failure to properly define the software requirements first. [Response to SOMF ¶ 24; SOAF ¶ 74].

### Alleged Misrepresentations and Software Development Issues

Edv alleges that Scopic misrepresented the hours required to build ElementsWeb in its June 19, 2019 proposal and its May 13, 2020 estimate. [SOMF ¶ 26]. The parties dispute whether Scopic's work estimates were reasonable. [Response to SOMF ¶ 26; SOAF ¶ 75]. Edv claims that Doli made several misrepresentations regarding when the software would be ready, including statements in June 2020 that beta versions of both products would be ready within 1-2 weeks for testing; that Scopic was clearing bugs in WebCabinet software and expected to finish by the next day; a December 2020 statement that a stable version of WebCabinet Maker would be ready by Christmas; and a May 2021 statement that edv would soon have a bug-free version of the software it could start selling. [SOMF ¶ 28; SOAF ¶ 71].

Edv contends that Scopic failed to deliver functional software despite ongoing representations that progress was being made. [SOAF ¶ 70]. Specifically, edv asserts that Scopic failed to deliver a beta version of ElementsWeb that included either the basic functionality of the ElementsAV desktop application or a beta version of Milestone 1 as contemplated by the Specifications. [Id. ¶ 72]. Similarly, edv claims that Scopic delivered an incomplete and inadequate WebCabinet Maker software product. [Id. ¶ 73].

<b>Termination of the Contractual Relationship</b>

In the spring of 2021, Ellmeier became unhappy with Scopic's work. [SOMF ¶ 29]. During a recorded meeting on June 23, 2021, Ellmeier threatened: "I will say when Scopic destroys my company, I will have to destroy Scopic, I can guarantee you. I have social media software and I can make in [sic] ten accounts, all social media accounts automatically posts [sic] about our experience with Scopic. I can make five thousand posts within three weeks." [Id.]. Ellmeier threatened Scopic again in a June 30, 2021 message, writing: "Scopic damaged my business already significantly and if we don't get a satisfactory solution, it will have profound consequences for Scopic as well." [Id. ¶ 30]. The parties dispute whether Ellmeier's comments constituted actual threats or were simply expressions of frustration. Edv asserts that Ellmeier "was desperate because Scopic did not deliver anything" and that he "saw [his] company damaged." [SOAF ¶ 83].

On July 6, 2021, Scopic's Ivan Vucic gave edv notice of Scopic's intent to terminate the SSA, citing the damage to the relationship caused by Ellmeier's threats. [SOMF ¶ 32]. The termination notice offered to extend the termination period to 40 business days [instead of the 20 days provided in the SSA] to give edv time to find another vendor. [Id.]. On July 14, Ellmeier's associate Josef Fenniger responded to the email and said: "I was really shocked about your terminating the agreement. It is very difficult for me to understand as I took over the IKT project

from Hannes and made the payments on guru. I worked together with the team on jira and it was running well." [SOMF ¶ 33]. On July 16, Ellmeier responded, writing: "For now I suggest that the webcabinet team can finish their work with the web cabinet and put the latest code to gitea." [Id.]. The parties dispute whether Scopic properly invoked the termination clause in the SSA, with edv pointing to the termination provision in the Addendum. [Response to SOMF ¶ 32; SOAF ¶ 79]. Edv turned down Scopic's offer to work for another forty days on the WebCabinet Maker. [SOMF ¶ 34]. On August 3, 2021, Doli handed the code and existing WebCabinet Maker builds over to edv. [Id.].

Josef Fenniger, edv's associate, hoped to continue working on ElementsWeb independently through his own company. [Id. ¶ 35]. Although Scopic initially rejected the request, work continued on ElementsWeb for some weeks. [Id.]. On November 15, 2021, Doli informed Fenniger that ElementsWeb was deployed in edv's account. [Id.]. The parties dispute whether edv rejected delivery of either WebCabinet Maker or ElementsWeb. [Id. ¶ 36; Response to SOMF ¶ 36]. Ultimately, edv has not used the ElementsWeb code that Scopic developed. [SOMF ¶ 37]. Edv has developed its own version of WebCabinet Maker "without one single letter of code from Scopic" because Ellmeier "didn't want to give Scopic at any chance to say 'you used my code.'" [Id.]. Edv contends that after attempting to continue Scopic's work on WebCabinet Maker, it decided to build the software from scratch due to the poor quality of Scopic's code. [Response to SOMF ¶ 37; SOAF ¶ 87]. Edv retained CITW for this task. [SOAF ¶ 87].

## II.    Legal Standards

A motion for summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact" such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A movant must show that "there is an absence of evidence to

support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). The burden shifts "to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990) (collecting cases). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).

Issues are "genuine" when they require resolution from a finder of fact "because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250. In other words, there must be "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing version of the truth at trial." <u>Hahn v. Sargent</u>, 523 F.2d 461, 464 (1st Cir. 1975) (quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)). The "material" aspect of a summary judgment motion requires that a fact affect the outcome of the case. <u>Garside</u>, 895 F.2d at 48 (quoting <u>Anderson</u>, 477 U.S. at 248). Material issues are ones that "need to be resolved before the related legal issues can be decided." <u>Mack v. Great Atl. & Pac. Tea Co., Inc.</u>, 871 F.2d 179, 181 (1st Cir. 1989) (citing <u>Greenberg v. P.R. Mar. Shipping Auth.</u>, 835 F.2d 932, 934 (1st Cir. 1987)). In analyzing motions for summary judgment, all reasonable inferences are drawn in favor of the nonmoving party. <u>Gattineri v. Wynn MA, LLC</u>, 63 F.4th 71, 85 (1st Cir. 2023) (quoting <u>Doe v. Tr. of Bos. Coll.</u>, 892 F.3d 67, 79 (1st Cir. 2018)). Parties may not rely on "conclusory allegations or substantiated denials" and must take facts "derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." <u>Magee v. United States</u>, 121 F.3d 1, 3 (1st Cir. 1997) (citing Fed. R. Civ. P. 56(c) & (e)).

"Local Rule 56.1 was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of

determining whether the disputed issues are material." <u>Butters v. Wells Fargo Advisors, LLC</u>, No. 10-10072-MLW, 2012 WL 5959986, at *1 (D. Mass. Nov. 27, 2012) (quoting <u>Brown v. Armstrong</u>, 957 F. Supp. 1293, 1297 (D. Mass.), <u>aff'd</u>, 129 F.3d 1252 (1st Cir. 1997)). The non-moving party must state the specific facts that are disputed which prevent the granting of summary judgment. <u>Brown</u>, 957 F. Supp. at 1297 (citing <u>Vasapolli v. Rostoff</u>, 864 F. Supp. 215, 218 (D. Mass. 1993), <u>aff'd</u>, 39 F.3d 27 (1st Cir. 1994)). The nonmovant must "go beyond merely asserting the existence of a disputed and material fact[,]" and produce evidence that "substantially proves the existence of such a disputed fact." <u>Lucia v. Prospect St. High Income Portfolio, Inc.</u>, No. 90-10781-MA, 1993 WL 761409, at *5 (D. Mass. Aug. 26, 1993) (citing <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1262 (1st Cir. 1991)).

In any event, if there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,]" the Court will deny the motion. <u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 249). Otherwise, the motion should be granted.

### III. Discussion

Before the Court reach Scopic's motion for summary judgment, it must consider the pending motion to strike portions of the summary judgment record. [<u>See</u> ECF No. 79].

#### A. Motion to Strike

Pursuant to Federal Rule of Civil Procedure 56, "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). When considering a motion for summary judgment, "a court may take into account any material that would be admissible or usable at trial

9

. . . [but] inadmissible evidence may not be considered." <u>Horta v. Sullivan</u>, 4 F.3d 2, 8 (1st Cir. 1993). "A motion to strike is the appropriate means of objection to the use of affidavit evidence on a motion for summary judgment." <u>Facey v. Dickhaut</u>, 91 F. Supp. 3d 12, 19 (D. Mass. 2014). "The moving party must specify the objectionable portions of the affidavit and the specific grounds for objection. Furthermore, a court will disregard only those portions of an affidavit that are inadmissible and consider the rest of it." <u>Casas Office Machs., Inc. v. Mita Copystar Am., Inc.</u>, 42 F.3d 668, 682 (1st Cir. 1994).

Scopic seeks to strike paragraphs 3-4 and 11-16 of edv's Ellmeier Affidavit, [ECF No. 77-1], on grounds that the statements were not made on personal knowledge and contain inadmissible hearsay. As an initial matter, it is important to note that the affidavit begins with Ellmeier's attestation that the statements therein are "based on my personal knowledge[.]" [<u>Id.</u> at 1]. In paragraphs 3-4, Ellmeier states "[<u>b]ased on my discussions</u> with Tim Burr, I believed that decisions concerning the software development process were made at a unified corporate level from Massachusetts." [<u>Id.</u> ¶ 3 (emphasis added)]. He adds that he "consistently believed that overarching decisions about the process and pricing for the development of [his] software projects were made in Massachusetts," and that he "always understood that [his] Scopic payments were directed to a Massachusetts bank account." [<u>Id.</u> ¶¶ 3-4]. Scopic moves to strike these paragraphs because they reference Ellmeier's beliefs and understanding, not within Ellmeier's personal knowledge, regarding the location of Scopic's operations. This argument is without merit. To the contrary, Ellmeier's beliefs and understanding, based on his conversations with Tim Burr, show Ellmeier's state of mind, namely, what he understood and was thinking at the time. For that reason, the Court will deny Scopic's motion as to paragraphs 3-4 and consider them as part of the summary judgment record.

Next, in paragraphs 11-16, Ellmeier discusses the actions taken by CITW after edv commissioned it to build a version of WebCabinet Maker based on Scopic's work. Specifically, the Ellmeier Affidavit states that "CITW pointed out that the quality of Scopic's code was very poor" and "reported that the user interface did not perform well and it was inflexible." [Id. ¶ 11]. Consequently, "CITW and edv came to the conclusion that it would be more practical and cost-efficient to develop WebCabinet Maker from scratch," resulting in CITW spending approximately 47 hours to develop "a more functional system … than the last version from Scopic." [Id. ¶¶ 12-14]. Ellmeier adds that "even if CITW had taken on this dual-project role, I understand that there would be no guarantee that it would have been possible to simply 'fix' or 'finish' Scopic's work. Thus, it was best for CITW to develop the code from scratch." [Id. ¶¶ 15-16].

Scopic moves to strike paragraphs 11-16 because the statements therein include inadmissible hearsay and were not made on personal knowledge. In the Court's opinion, these paragraphs set out facts, not assertions by CITW. A statement for hearsay purposes may be an oral statement, a written statement, or nonverbal conduct that is intended as an assertion. Fed. R. Evid. 801(a). None of the paragraphs in dispute reference or identify any statements or conduct that CITW intended as an assertion.[3] Moreover, Ellmeier, who "serve[s] as the Manager for edv," attested to making the statements based on personal knowledge. [ECF No. 77-1 at 1]. He also explained that "[he] approached CITW about developing" WebCabinet Maker, that "[he] was charged for" the 120 hours CITW spent "attempt[ing] to continue the work that Scopic started," and that both "CITW and edv came to the conclusion that it would be more practical and cost-

---

[3] Even if those statements constituted hearsay, "a district court may consider hearsay evidence submitted in an inadmissible form at the summary judgment stage where the content of the evidence proffered could later be provided in an admissible form at trial." Edwards Granite Telecomms., Inc., No. 19-cv-12330, 2022 WL 974049, at *2 (D. Mass. Mar. 31, 2022). Scopic offers no argument explaining why these statements cannot be later produced in an admissible form. See Schuster v. Wynn Resorts Holdings, LLC, No. 19-cv-11679-ADB, 2023 WL 2248886, at *4 (D. Mass. Feb. 27, 2023).

efficient to develop WebCabinet Maker from scratch[.]" [Id. ¶¶ 9, 10, 12]. It is evident that Ellmeier made these statements based on personal knowledge not only due to his role at edv, but because he personally engaged and communicated with CITW to commission them to resume the work that Scopic had started. Accordingly, the Court will deny Scopic's motion with respect to paragraphs 11-16 and consider them as part of the summary judgment record.

### B. Scopic's Motion for Summary Judgment

#### 1. Count I – Breach of Contract

Count I alleges that Scopic improperly terminated the agreement with edv and failed to deliver completed versions of the software, thereby breaching the agreement. A plaintiff alleging breach of contract under Massachusetts law must demonstrate that the parties entered into a valid agreement; the plaintiff was ready, willing, and able to perform under the agreement; the defendant breached the agreement; and the plaintiff sustained damages as a result of the breach. Singarella v. City of Boston, 173 N.E.2d 290, 291 (Mass. 1961); see Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999). The parties' dispute focuses on whether Scopic improperly terminated the agreement and whether Scopic breached the agreement by failing to deliver completed versions of the software within specific timeframes, based on their differing interpretations of what the agreement requires.

In interpreting the terms of the governing contract, there is a factual issue for a jury to decide if the language is ambiguous, such that the terms are facially inconsistent or "reasonably susceptible to multiple, plausible interpretations." Nault v. United States, 517 F.3d 2, 4 (1st Cir. 2008); see Children's Hosp. Corp. v. George Wash. Univ., 750 F. Supp. 2d 239, 245 (D. Mass. 2010) (citations omitted). An unambiguous contract, on the other hand, must be enforced according to its plain terms. Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 176-

79 (1st Cir. 1995). A party has breached a contract if it has failed to perform, under the plain terms of the contract, and lacks a legal excuse for doing so. See Realty Developing Co. v. Wakefield Ready–Mixed Concrete Co., 100 N.E.2d 28, 30 (Mass. 1951).

Prior to engaging in contract interpretation, a court must assess whether the contract is ambiguous. See Bank v. Thermo Elemental, Inc., 888 N.E.2d 897, 907 (Mass. 2008). "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." Id. "Ambiguity is not created merely because the litigants disagree about the meaning of a contract." Farmers Ins. Exchange v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011) (quoting Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004)). Instead, "a contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." Id. (quoting Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998)).

### a. Termination

The Court starts out with the language of the SSA. Pursuant to its "Term and Termination" provision, "[t]he agreement has no specific term and will continue until one of the parties terminates the agreement," providing that "[t]he Client can terminate . . . with 5 business days" and "[t]he Provider can terminate . . . with 20 business days" by email notification and a return email from the other or Delivery and Read Receipts. [SOMF ¶ 7; ECF No. 66-5 at 5]. By contrast, the Addendum provides that the "Addendum and Temporary Incentives will remain in effect until the M3 completion. The Provider reserves the right to terminate this Addendum and cancel Temporary Incentives immediately in case of violation of its terms by the Client." [SOMF ¶ 17].

At its core, Scopic contends that the Addendum only modified the parties' arrangement with respect to Scopic's hourly rates by applying temporary incentives or discounts during certain stages of its work. Thus, Scopic maintains that the Addendum's termination provision only governed the application of those temporary incentives. From its part, edv avers that the Addendum's termination provision entirely superseded the termination provision in the SSA. Scopic has the better argument. Although this agreement is not exactly an example of good contract drafting, it is apparent that the Addendum's termination provision only affects the enforcement of the temporary incentives. As an initial matter, the provision appears under the heading "Effect and Termination of the Temporary Incentives." [ECF No. 66-9 at 2 (emphasis added)]. Tellingly, the provision only discusses the duration of the Addendum and Temporary Incentives as well as Scopic's right to terminate the Addendum and cancel the Temporary Incentives. [Id. (emphasis added)]. Moreover, the plain language of this section does not otherwise speak as to the parties' termination rights as it relates to the SSA. [See id.].

Even interpreting the words in the termination provision, "giving full effect to the document as a whole," Given v. Com. Ins. Co., 796 N.E.2d 1275, 1277 (Mass. 2003), the Court is unconvinced that a reasonable person could interpret it in the manner proposed by edv, see Nadherny v. Roseland Prop. Co., 390 F.3d 44, 49 (1st Cir. 2004). A review of the Addendum reveals that its terms mainly focused on Scopic's hourly rates, the discounted rates that Scopic would apply, and the term and duration of the application of those discounted rates. For instance, at the outset, under the heading "Definitions," the Addendum provides that "Temporary Incentives" refer to "discounted rates as defined herein that are charged by the Provider for the work on IKT Online-Administration-Software project in line with the terms of this Addendum." [ECF No. 66-9 at 1]. Several sections later, under the heading "Temporary Incentives by

milestone," the Addendum explains that "[e]ach milestone will have the Temporary Incentive that is applied expressly and exclusively during the term of the milestone and expires upon its completion." [Id. at 2]. In the next section, titled "Milestone Completion," the Addendum explains that milestone is deemed completed when, among other things, "the Client refuses to perform Acceptance Testing or unreasonably delays it . . . 5 business days after its being delivered." [Id.]. The "Effect and Termination of the Temporary Incentives" section containing the termination provision at issue follows two sections later. It is under this context that the provision must be read. And when the provision is interpreted based upon its plain meaning, the Court cannot reasonably conclude that the Addendum superseded the SSA's termination provision. Such interpretation is untenable.

Because the contract is unambiguous, the Court need not engage with and examine the proffered extrinsic evidence. See Alicea v. Machete Music, 744 F.3d 773, 786 (1st Cir. 2014) ("[E]xtrinsic evidence may be used as an interpretative guide only after the judge or court determines that the contract is ambiguous on its face or as applied." (quoting Thermo Elemental, Inc., 888 N.E.2d at 908)). The agreement between the parties, including the SSA, the Addendum, and the import of the documents as a whole, as well as the plain language of the Addendum's termination provision, make clear that edv's interpretation is unacceptable.

Accordingly, Scopic possessed a right to terminate with 20 days email notice and return email from edv or Delivery and Read Receipts. The record shows that, on July 6, 2021, Scopic emailed edv to invoke its right to terminate the agreement, offering to extend the termination notice to forty days. [SOMF ¶ 32]. On July 14 and 16, both Ellmeier and his associate Josef Fenniger

15

replied to Scopic's email, effectively satisfying the conditions in the termination provision. [Id. ¶ 33]. Scopic's actions did not therefore breach the agreement.[4]

### b. Failure to Deliver Software

Next, edv contends that Scopic breached the agreement because it did not deliver completed versions of ElementsWeb or WebCabinet Maker within specific timeframes. Although Scopic admits that neither project was completed when they handed the source code to edv, Scopic maintains that the SSA and the Addendum did not require it to complete either of the projects by any given date. Starting with the SSA, under the heading "Project Personnel, Estimates, Reporting & Deliverables," the document provides that "[t]he Client can request and the Provider will provide, estimates for the initial scope of work and any later additions/changes thereto." [ECF No. 66-5 at 1 (emphasis added)]. The provision goes on to states that "estimates are non-binding and only provided for Client information and planning purposes." [Id. (emphases added)]. Although "[t]he Provider can provide precision and confidence information for estimates[,]" "this does not imply any cap on hours." [Id. (emphases added)]. The SSA also allows the parties to "work together to determine the frequency of deliverables and the specific content and stability/completeness of each deliverable." [Id.]. However, other than indicating that "[t]he Client will be billed at two hourly rates split by tasks," [id. at 2 (emphasis added)], the SSA does not indicate that Scopic would deliver to edv versions of ElementsWeb and WebCabinet Maker, at any stage of completion, by a specific deadline. The repeated references to non-binding estimates, hourly rates, and the lack of caps on hours, reasonably suggest the absence of a binding agreement by Scopic to perform its services in a certain manner or by a certain deadline.

---

[4] Given the Court's finding that Scopic did not breach the agreement because the Addendum's termination provision did not supersede the termination provision in the SSA, the Court need not analyze whether Scopic was entitled to terminate the agreement due to a breach of the implied covenant of good faith and fair dealing.

By contrast, the Addendum appears to get closer to the heart of the matter by repeatedly referencing the scope of work (or SOW) and delineating milestones. Under the heading "SOW," the Addendum provides that "[t]he SOW is split into three milestones: Milestone 1 (M1), Milestone 2 (M2) and Milestone 3 (M3) respectively." [Id. at 1]. As aforementioned, each milestone is deemed completed when, among other things, "the Client refuses to perform Acceptance Testing or unreasonably delays it . . . 5 business days after its being delivered." [Id. at 2]. The only suggestion of a deadline is provided for when edv exercises its right "to terminate or pause the work by sending the respective notice to [Scopic] at least 5 business day[s] prior to the pause." [Id. at 1]. If the work is subsequently resumed, the Addendum explains that Scopic "will adjust the date of the work/milestone completion if any are agreed by the parties." [Id. (emphases added)]. Nevertheless, the Addendum contains nothing suggesting a deadline of any sort within which Scopic was required either to complete a milestone or even an entire project.[5] The Court cannot thus reasonably conclude that the language in both the SSA and the Addendum contractually bound Scopic to deliver software within a specific timeframe. Because the agreement is also unambiguous as it relates to this issue, the Court will refrain from considering extrinsic evidence. See Alicea, 744 F.3d at 786 (1st Cir. 2014).

Accordingly, the Court finds that the agreement between the parties did not require Scopic to deliver software at any stage of development by any specific date. Given that edv has failed to demonstrate that Scopic failed to perform under these terms, the Court finds that Scopic did not breach the agreement by failing to deliver complete versions of ElementWeb and WebCabinet Maker.

---

[5] While the Court recognizes that there is a factual dispute as to whether the terms in the Addendum only applied to the ElementsWeb project, that issue is immaterial to the determination of whether the agreement between the parties provided for any specific deadlines.

Therefore, the Court will grant Scopic's motion for summary judgment as to Count I.

### 2.  Count II – Breach of the Covenant of Good Faith and Fair Dealing

In Count II, edv alleges that Scopic breached the covenant of good faith and fair dealing by misrepresenting its ability to deliver the software and improperly terminating the agreement. "Under Massachusetts law, every contract implies good faith and fair dealing between the parties to it." Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013) (citation omitted). "The covenant of good faith and fair dealing requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'" Id. at 237-38 (quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 704 (Mass. 2010)). "Put another way, the parties to a contract implicitly agree 'to deal honestly and in good faith in both the performance and enforcement of the terms of their contract.'" Biltcliffe v. CitiMortgage, Inc., 952 F. Supp. 2d 371, 381 (D. Mass. 2013) (quoting Hawthorne's, Inc. v. Warrenton Realty, Inc., 606 N.E.2d 908, 914 (Mass. 1993)). Thus, "[t]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Id. (alteration in original) (quoting Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004)).

"A breach [of the covenant of good faith and fair dealing] occurs when one party violates the reasonable expectations of the other." Weiler v. PortfolioScope, Inc., 12 N.E.3d 354, 362 (Mass. 2014) (quotations and citations omitted). "There is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith." Robert & Ardis James Found. v. Meyers, 48 N.E.3d 442, 450 (Mass. 2016) (quoting Weiler, 12 N.E.3d at 362). "However, '[t]he scope of the covenant is only as broad as the contract that governs the particular relationship.'" Id. (quoting Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684, (Mass. 2005)). To establish this

claim, the plaintiff must present "evidence to demonstrate a lack of good faith, such as 'a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will.'" Clinical Tech., Inc. v. Covidien Sales, LLC, 192 F. Supp. 3d 223, 237 (D. Mass. 2016); see Sonoran Scanners, Inc. v. Perkinelmer, Inc., 585 F.3d 535, 541 (1st Cir. 2009) ("Establishing a violation of the covenant of good faith and fair dealing requires at least bad faith conduct."); T.W. Nickerson, 924 N.E.2d at 706-07 (concluding plaintiff failed to prove a lack of good faith when it did not present evidence that defendant acted with motive of harming the plaintiff's rights, had any other improper motive, or acted in order to gain an advantage for itself).

Edv alleges that Scopic breached the implied covenant of good faith and fair dealing in two ways: first, by misrepresenting its ability to deliver ElementsWeb and WebCabinet Maker; and second, by improperly terminating the agreement in bad faith. The latter fails because, as explained supra, the terms of the Addendum did not supersede the SSA's termination provision. Accordingly, the agreement allowed Scopic to terminate with 20 days email notice and return email from edv or Delivery and Read Receipts. Edv could not have reasonably understood otherwise. Moreover, the record is devoid of any evidence showing that Scopic terminated the agreement in bad faith. Although edv repeatedly points to Mr. Doli's assertions, stating that Scopic could "make a lot more money anywhere else," [ECF No. 78 at 8, 13; ECF No. 77 at 24], a review of the transcript reveals that edv takes that statement out of context. Mr. Doli did not assert that Scopic decided to terminate the agreement because they could "make a lot more money anywhere else." [ECF No. 66-13 at 123:25-125:20]. Rather, he explained that edv's threat was "not only unjust but uncalled for," given Scopic's deep investment on the projects, including time, labor, and rate discounts, all resources which could have been used "to make a lot more money anywhere else." [Id.]. Edv does not otherwise introduce any additional allegations of bad faith. Where, as here, a party "has

exercised an express contractual power in good faith—that is, in a manner that comports with the parties' reasonable expectations as to performance," there can be no actionable claim for breach of the covenant of good faith and fair dealing. <u>Speakman v. Allmerica Fin. Life Ins.</u>, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).

With respect to edv's claims that Scopic misrepresented its ability to develop ElementsWeb and WebCabinet Maker, edv contends that Scopic made numerous misrepresentations to induce it to enter into a contractual relationship and later to maintain that relationship. The alleged misrepresentations concerned Scopic's capabilities and staffing, time and cost estimates for completion of both projects, status of the ongoing work, and the inclusion of certain features for the products. [ECF No. 65 at 13, 16-17; ECF No. 78 at 15]. First, Scopic's statements about its capabilities and staffing, including assertions that it employed "top talent globally," and that the "vast majority of Scopic hourly projects are completed within established estimates," [ECF No. 65 at 13, 16; ECF No. 66 ¶ 25], cannot form the basis for a claim of breach of the covenant of good faith and fair dealing.[6] Under Massachusetts law, "[a] statement on which liability for misrepresentation may be based must be one of fact, not of expectation, estimate, opinion, or judgment." <u>von Schönau-Riedweg v. Rothschild Bank AG</u>, 128 N.E.3d 96, 118 (Mass. App. Ct. 2019). As such, Scopic's statements referring to estimates cannot be reasonably considered a representation, <u>see</u> <u>Adar Investments, LLC v. Bayview Loan Servicing, LLC</u>, 33 N.E.3d 1266, 2015 WL 3935695, at *3 (Mass. App. Ct. 2015), especially in light of the agreement's disclaimers that "<u>estimates</u> are <u>non-binding</u> and only provided for Client information and planning purposes." [ECF No. 66-5 at 1 (emphases added)]. Moreover, Scopic's statements regarding its employment of "top talent" are nothing more than statements of opinion akin to seller's talk or puffery. Even if

---

[6] "The determination of whether a statement is one of fact or opinion is generally considered a question of law." <u>Cole v. Westinghouse Broad. Co.</u>, 435 N.E.2d 303, 309 (Mass. 1982).

these consisted of "false statements of opinion, of conditions to exist in the future, and promises to perform an act," they could not be actionable "unless the promisor had no intention to perform the promise at the time it was made." Cumis Ins. Society, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 49 (Mass. 2009); see Ruggers, Inc. v. U.S. Rugby Football Unition, Ltd., 843 F. Supp. 2d 139, 147 (D. Mass. 2012). Accordingly, edv's claim fails as a matter of law as to these statements.

Second, edv maintains that Scopic misrepresented the status of ongoing work, and its ability to complete certain specifications and fix bugs in the software as well as to deliver functional software. [ECF No. 65 at 13, 16-17; ECF No. 66 ¶ 28]. "The requirement of good faith performance is, however, circumscribed by the obligations in the contract." Speakman, 367 F. Supp. 2d at 132 (citing AccuSoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001)). Namely, the covenant does not create any rights or duties that are not contemplated by the terms of the contract. See Uno Rests., 805 N.E.2d at 964. Here, the agreement explicitly contemplates non-binding estimates that were "only provided for Client information and planning purposes" and not intended to "imply any cap on hours." [ECF No. 66-5 at 1]. Moreover, the alleged misrepresentations were limited to non-actionable timing estimates that do not speak as to Scopic's fundamental abilities or its intent to perform. See von Schönau-Riedweg, 128 N.E.3d at 118; Adar Investments, 2015 WL 3935695, at *3. For instance, edv alleges that Scopic represented in June 2020 that a beta version of the software would be available within 1-2 weeks for testing; that Scopic was clearing bugs in WebCabinet Maker and expected to finish that work by the next day; that a stable version of WebCabinet Maker would be ready to test within a few days by Christmas 2020; and that Scopic did not encounter any bugs during testing, but would continue testing over the coming days, and expected that edv would have a version that it could start selling. [ECF No. 77 ¶ 28].

Massachusetts courts have consistently held that errors in judgment, overly optimistic projections, or occasional missed deadlines do not constitute bad faith, particularly in contractual relationships such as this one, in which the primary obligation is continued work rather than meeting fixed deadlines. See, e.g., Nagel v. Provident Mut. Life. Ins. Co., 749 N.E.2d 710, 714-15 (incorrect denial of insurance claim, without more, does not rise to the level of bath faith or unfair dealing); Owen v. Kessler, 778 N.E.2d 953, 958 (Mass. App. Ct. 2002) (finding that "buyer's reasonable expectations were defined by the express 'time is of the essence' clause" in a purchase and sale agreement); T.W. Nickerson, Inc., 924 N.E.2d at 706-07 (holding that there was no breach of the implied covenant because plaintiff did not present evidence showing that the defendant acted with motive to harm plaintiff's rights, had any other improper motive, or acted "in order to gain an advantage for itself"). While better communication about missed deadlines would have been preferable, such communication failures in this context do not give rise to an actionable claim for breach of the covenant of good faith and fair dealing. The covenant is not a mechanism to penalize imperfect performance, but rather to prevent a party from acting in a manner that would deprive the other party of the benefit of the contractual relationship—a standard not met with respect to these statements either. See Young, 717 F.3d at 237-38.

### 3. Counts III and IV – Implied Warranties

In Counts III and IV, edv claims that Scopic breached the implied warranties for merchantability and fitness for a particular purpose, governed by the Massachusetts Uniform Commercial Code ("UCC"). The UCC applies only to contracts for the sale of goods. White v. Peabody Constr. Co., Inc., 434 N.E.2d 1015, 1021 (Mass. 1982). Where, as here, the underlying sequence of events gives rise to a mixed contract claim, the court must determine whether the contract is predominately one for goods or services. "The test is whether the predominant factor,

22

thrust, or purpose of the contract is (1) the rendition of service, with goods incidentally involved, or is instead (2) a transaction of sale, with labor incidentally involved." Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co., 520 N.E.2d 1321, 1324 (Mass. App. Ct. 1988) (cleaned up). If the predominant purpose of the transaction was the "rendition of service," then the UCC does not provide a remedy. See id.; White, 434 N.E.2d at 1021.

"Software is not clearly a good or a service in the abstract, and may qualify as either depending on the particular circumstances of the case." Rottner v. AVG Tech. USA, Inc., 943 F. Supp. 2d 222, 230 (D. Mass. 2013) (collecting cases) (noting that courts "have consistently classified the sale of a software package as the sale of a good for UCC purposes."). "[S]ometimes the creation and adaptation of software renders that software not a good, but a service." ACI Worldwide Corp. v. KeyBank Nat'l Ass'n, No. 1:17-cv-10662-IT, 2020 WL 1025418, at *13 (D. Mass. Feb. 28, 2020) (citing Simulados Software, Ltd. v. Photon Infotech Private, Ltd., 40 F. Supp. 3d 1191, 1200-01 (N.D. Cal. 2014)). In Simulados, the Northern District of California held that "[w]here software is designed from scratch, or the transaction is mainly for one party's knowledge and skills in creating software, the software is often found to be service rather than a good." 40 F. Supp. 3d at 1201. In reaching this holding, the court relied on its prior decision in Systems America, Inc. v. Rockwell Software, Inc., No. C-03-2232, 2007 WL 218242 (N.D. Cal. Jan. 26, 2007), where it held that a software development agreement was not governed by the UCC because "[t]he essence or thrust" of the agreement was the "development of software from scratch." Id. at *4. The court explained that the software development agreement "may have been formed with the ultimate purpose of creating software that [the defendant] could sell as goods to its customers, but that purpose does not transform a development contract into a contract for a sale of goods." Id.

Similarly, here, it is undisputed that edv commissioned Scopic to develop WebCabinet Maker and ElementsWeb pursuant to the Software Services Agreement. [ECF No. 77 ¶ 9]. Tellingly, the Software Services Agreement indicates that Scopic, as the provider, "will provide software development services." [ECF No. 66-5 at 1 (emphasis added)]. Scopic also acknowledged that it has no rights or interest in any of the work product "resulting from the services performed under this Contract," and agreed that "the services and products listed in this Agreement, were commissioned by [edv] as works made-for-hire[.]" [Id. at 4 (emphases added)]. Although software may be considered a good, see Rottner, 943 F. Supp. 2d at 230, edv was not purchasing WebCabinet Maker and Elements Web from Scopic. Rather, Scopic provided a service to design, develop, and test the software from scratch. Because the predominant focus of the contract was to render a service, we conclude that the UCC does not apply to this transaction. Consequently, edv's claims for breach of the implied warranties of merchantability and fitness for a particular purpose, both of which are governed by the UCC, must be dismissed.

In an attempt to sidestep this conclusion, edv attempts to recast its warranty claims as originating under common law "in a vein similar to a professional negligence claim." [ECF No. 78 at 14]. This attempt is futile. Not only did edv assert these claims as arising under the UCC in its complaint, [ECF No. 1 ¶¶ 31 ("Pursuant to G.L. c. 106 § 2-314, Scopic made an implied warranty that the Software would conform to the industry standard."), 36 ("Pursuant to G.L. c. 106 § 2-315, Scopic made an implied warranty that the Software would be fit for its intended purpose.")], but it also undertook discovery premised on the warranties as arising under the UCC [see ECF No. 66-15, Supplemental Answer No. 19 (referring to December 7, 2021 G.L. c.93A demand letter outlining factual and legal basis for edv's position that Elements Web and WebCabinet Maker are "goods" for the purposes of the Massachusetts Uniform Commercial

24

Code)]. Further, edv never sought to amend its complaint. It is well-settled that a party may not "raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment." Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 76 (1st Cir. 2016). This is to ensure that the opposing party has timely and complete notice of the allegations so that they can adequately defend themselves. See Ellis v. N. Andover Pub. Schools, 569 F. Supp. 3d 61, 65 (D. Mass. 2021). Because these allegations are improperly before the Court, it will decline entertaining them.

### 4.  Count V – Misrepresentation

In Count IV, edv claims that Scopic made multiple misrepresentations that induced it to enter into and maintain a contractual relationship with Scopic. To establish liability for misrepresentation, a plaintiff must prove all five elements of common law fraud: "(1) that the statement was knowingly false; (2) that [the defendants] made the false statement with the intent to deceive; (3) that the statement was material to the plaintiffs' decision to sign the contract; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance." Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 225 (1st Cir. 2003) (quoting Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st Cir. 1986)); see also Roadmaster Indus., Inc. v. Columbia Mfg. Co. Inc., 893 F. Supp. 1162, 1176 (D. Mass. 1995); Int'l Totalizing Sys., Inc. v. Pepsico, Inc., 560 N.E.2d 749, 753-56 (Mass. App. Ct. 1990) (concerning decision to reject offer).

To prevail on a misrepresentation claim, the plaintiff need not prove that the defendant actually knew its statement was false:

> In this Commonwealth it has been held in a long line of cases that the charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual

knowledge; and in such case it is not necessary to make any further proof of an actual intent to deceive.

Logan Equip. Corp. v. Simon Aerials, Inc., 736 F. Supp. 1188, 1199 (D. Mass. 1990) (quoting Nickerson v. Matco Tools Corp., 813 F.2d 529, 530 (1st Cir. 1987)); see also Roadmaster Indus., 893 F. Supp. at 1176.

As noted, the representation at issue needs to be one of fact and not merely opinion. See McEneaney v. Chestnut Hill Realty Corp., 650 N.E.2d 93, 96 (Mass. App. Ct. 1995) ("The distinction between a statement of fact and a statement of opinion is often a difficult one to draw.") (citing Fogarty v. Van Loan, 183 N.E.2d 111 (Mass. 1962)). "A representation is one of opinion if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value, authenticity, or other matters of judgment." Id. (quoting Restatement (Second) of Torts § 538A (1977)). A statement "that in form is one of opinion" may, however, be a statement of fact if the intended recipient could reasonably understand the statement "as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it." Id. (citing Briggs v. Carol Cars, Inc., 553 N.E.2d 930 (Mass. 1990) (holding that dealer's representation that car was in "good condition" was statement of fact)). By contrast, a "statement which amounts to 'nothing more than a kind of self-directed corporate puffery' is not actionable." Millen Indus., Inc. v. Flexo-Accessories Co., Inc., 5 F. Supp. 2d 72, 74 (D. Mass. 1998) (citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1218 (1st Cir. 1996)).

As stated supra, edv alleges that Scopic made multiple misrepresentations regarding Scopic's capabilities and staffing, time and cost estimates for completion of WebCabinet Maker and ElementsWeb, status of the ongoing work, and the inclusion of certain features for the products. [ECF No. 65 at 13, 16-17; ECF No. 78 at 15]. The Court will grant summary judgment in Scopic's favor for the same reasons it held that these representations did not breach the covenant

of good faith and fair dealing. See supra. In short, Scopic's statements amounted to nothing more but non-binding estimates, conditions to occur in the future, statements of opinion or judgment, and seller's talk or puffery. Edv could not have reasonably understood those statements otherwise. Because none of these statements amount to an actionable representation, edv's claim fails as a matter of law.

     5.   Count VI – Unfair or Deceptive Practices (Mass. Gen. Laws ch. 93A § 11)

     In Count VI, edv avers that Scopic committed unfair or deceptive acts or practices when it allegedly induced edv to enter into and maintain a contractual relationship with Scopic. Chapter 93A creates a cause of action for anyone who suffers an economic loss while engaging in trade or commerce because of another person using an "unfair method of competition or an unfair or deceptive act." Katz v. Belveron Real Est. Partners, LLC, 28 F.4th 300, 313 (1st Cir. 2022) (quoting Mass. Gen. Laws ch. 93A, § 11). A breach of contract alone is not sufficient to establish a claim under Chapter 93A. Secure Our City, Inc. v. ECI Sys., LLC, 594 F. Supp. 3d 96, 105 (D. Mass. 2022). However, a party knowingly violating its contractual agreements in order to secure an unwarranted benefit for themself does constitute a violation of Chapter 93A. Formulatrix, Inc. v. Rigaku Automation, Inc., 344 F. Supp. 3d 410, 430 (D. Mass. 2018). The party alleging the breach must demonstrate "the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party." Secure Our City, 594 F. Supp. 3d at 105, (evidence of nonpayment, without economic coercion, was not enough to demonstrate an unfair or deceptive business practice) (citations omitted).

     The parties acknowledge that edv's Chapter 93A claim is derivative of the underlying claims. [ECF No. 65 at 17; ECF No. 78 at 17]. "Where a Chapter 93A claim is wholly derivative of a claim under common law, statute, tort, or contract, and summary judgment is granted as to that claim, summary judgment should normally be granted as to the Chapter 93A claim, as well."

Gattineri v. Wynn MA, LLC, No. 18-11229-FDS, 2022 WL 123892, at *14 (D. Mass. Jan. 13, 2022) (collecting cases), aff'd, 93 F.4th 505, 511 (1st Cir. 2024). Thus, to the extent edv relies on the allegations underlying Counts I through V to support its Chapter 93A claim, the endeavor fails. See Cold Spring Green, LLC v. E. Bos. Savings Bank, 170 N.E.3d 363, 2021 WL 2589144, at *3 (Mass. App. Ct. 2021) ("A c. 93A claim has no merit if it is wholly derivative of a meritless common-law claim[.]").

Edv claims that there are facts within those claims supporting an independent Chapter 93A claim, specifically the allegation that Scopic had an ulterior motive in not working diligently on the edv project, but those are precisely the types of facts that the Supreme Judicial Court has held are "derivative." See Gattineri, 93 F.4th at 511-13 (collecting cases and affirming summary judgment where Chapter 93A claim centered on same alleged misconduct of other dismissed claims). Indeed, edv raised this allegation to support its overall theory that Scopic manufactured a reason to terminate the contractual relationship. [See ECF No. 78 at 7-8 ("Scopic instead wanted to end the relationship. Scopic has acknowledged that by terminating the relationship it could 'make a lot more money anywhere else.'")]. This goes to the heart of edv's other claims. [See id. at 9-10 (asserting that Scopic improperly terminated the Software Services Agreement, thereby committing breach, "after it believed it could make more money elsewhere"); id. at 12-13 (asserting that Scopic breached covenant of good faith and fair dealing because "it saw opportunities to make more money elsewhere," among other reasons); ECF No. 77 at 24 ("Scopic acknowledged that by terminating the relationship it could 'make a lot more money anywhere else.' Scopic terminated the parties' agreement in July 2021.")]. As such, the Court is unconvinced that any facts are separate and distinct from the other claims to allow the Chapter 93A claim to go

forward. See Cold Spring Green, 2021 WL 25899144, at *3. Scopic's motion for summary judgment is therefore granted as to Count VI.

### 6. Leave to Amend Complaint

In its opposition to Scopic's motion for summary judgment, edv asserts that "to the extent any Counts are dismissed, edv must be given leave to amend" the Complaint. [ECF No. 78 at 19-20]. That matter should be addressed by separate motion pursuant to Local Rule 7.1. Endurance Am. Specialty Ins. Co. v. Northland Inv. Corp., No. 18-cv-10724, 2018 WL 2994405, at *1 (D. Mass. June 14, 2018) (finding that under Local Rule 7.1 all request for relief "must be filed as a separate motion, and not contained in a response to another motion"). The Court acknowledges edv's position that "this issue does not need to be decided now," [ECF No. 78 at 20], but to the extent edv is asking for relief and the request is procedurally proper, the Court is not convinced that edv has met its burden. "When a motion for summary judgment is pending and discovery has been completed it is clearly established that the proposed amendment must be not only theoretically viable but also solidly grounded in the record." Corrigan v. Covidien LP, 748 F. Supp. 3d 1, 16 (D. Mass. 2024) (cleaned up) (quoting Somascan, Inc. v. Philips Med. Sys. Nederland, B.V., 714 F.3d 62, 64 (1st Cir. 2013)). Edv made its request for leave to amend after the close of discovery in its response to Scopic's motion for summary judgment. Although edv contends that it would "add the CIGS in place of the UCC; a claim for professional negligence; and a claim for negligent supervision (to the extent that Scopic continues to argue that its employees or contractors working remotely bring this outside the scope of Chapter 93A)," [ECF No. 78 at 20], it fails to explain why these claims are viable and supported by substantial evidence, see Somascan, 714 F.3d at 64-65 (quoting Hatch v. Dep't for Child., Youth & Their Fams., 274 F.3d 12, 19 (1st Cir. 2001)). Edv's request is therefore denied without prejudice.

29

### C.  Motion to Exclude

Also pending before the Court is Scopic's Motion to Exclude the Testimony of Glenn Ricciardelli [ECF No. 68]. Edv introduced Mr. Ricciardelli's expert testimony to support its allegations of lost profits, resulting from Scopic's failure to deliver finished software. Scopic moves to exclude his opinion, alleging that it is unreliable for several reasons. Because summary judgment is being granted as to all claims, the Court need not rule on the motion and will be denied as moot.

### IV.    Conclusion

For the reasons stated above, Scopic's Motion to Strike Paragraphs 3-4 and 11-16 of the Affidavit of Johannes Ellmeier [ECF No. 79] is **DENIED**; Scopic's Motion for Summary Judgment [ECF No. 64] is **GRANTED** on all counts in accordance with this memorandum of decision; and Scopic's Motion to Exclude the Testimony of Glenn Ricciardelli [ECF No. 68] is **DENIED AS MOOT**.

**SO ORDERED.**

Dated: March 24, 2025

 _/s/ Margaret R. Guzman_
Margaret R. Guzman
United States District Judge